JOHN K. STANDLEY AND ANNE STANDLEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 73591. Filed October 19, 1960.

*Curtis C. Legerton, Esq.,* for the petitioners.
*Michael P. McLeod, Esq.,* for the respondent.

TIETJENS, *Judge:* The respondent determined a deficiency in income tax of $7,426.81 for the calendar year 1953. The sole issue presented is whether the petitioner qualifies under the provisions of section 107(b), I.R.C. 1939.

### FINDINGS OF FACT.

The facts stipulated are incorporated herein by reference.

John K. Standley, herein referred to as petitioner, and Anne Standley are, and at all times herein pertinent were, husband and wife. For the year 1953, John and Anne Standley filed a timely cash basis joint income tax return with the director of internal revenue, Los Angeles, California.

The petitioner is a stage performer who began his career when a child by acting on the stage with other members of his family. At about 14 or 15 he began a solo act assuming the character and appearance of a country preacher. His act, which he performed under the title "It's in the Book," consisted of satirical monologues based upon well-known nursery rhymes and novelty songs. His success lies in his unique style of delivery.

Prior to 1952 petitioner perfected and performed various acts before live audiences, one of which included a stage version of a monologue relating to "Little Bo-Peep" and variations of a song entitled "Grandma's Lye Soap."

In 1947 petitioner met Art Thorsen, herein referred to as Thorsen, who was the manager of band leader Horace Heidt, was interested in phonograph recordings, and after seeing petitioner's performance, commented that he thought the petitioner had the material for a great novelty record. Thorsen returned occasionally to observe modifications the petitioner made from time to time in the routine.

Horace Heidt, herein referred to as Heidt, auditioned the petitioner in 1950 and he became a member of Heidt's traveling show. In 1951 petitioner joined New Stars, Inc., one of the Heidt corporate units, where he continued to perform and perfect his various acts.

After having heard the petitioner's routine in 1950, Heidt also thought the petitioner had the possibilities to make a successful phonograph record. Thereafter, Heidt, Thorsen, and the petitioner, as well as a number of writers, worked at revising and editing the material used by the petitioner in his shows. This was accomplished primarily by observing performances of the monologue by the petitioner in order to ascertain the reaction of the audience and thereby edit it properly.

This revising and editing was done during petitioner's performances or during any spare time which arose, the object being to delete offensive passages and condense it from 13 or 14 minutes to approximately 3 minutes, the commercial limit of a successful phonograph record.

A number of the satirical nursery rhymes from the petitioner's repertoire were tried, such as "Jack and Jill," "The Old Lady in the Shoe," "Rub-a-Dub Dub, Three Men in a Tub," "Little Miss Muffet," and "Jack Horner." It was finally decided that "Little Bo-Peep" was the most adaptable for recording purposes.

A song entitled "Grandma's Lye Soap" used by the petitioner in his act and written by Thorsen and the petitioner after he joined the Heidt organization was put on the other side of the record. The entire record was distributed under the title "It's in the Book."

On November 1, 1951, Magnolia Record Company, herein referred to as the Record Company, a California corporation wholly owned by Heidt, entered into a written contract with the petitioner to make the phonograph record and agreed to pay the petitioner the sum of 2 cents for each record sold.

In September 1952, a certificate of copyright on "It's in the Book" was applied for and issued on October 10, 1952. Also in September 1952, Thorsen, as author of the music and petitioner, as

author of the words, applied for a certificate of copyright on the song "Grandma's Lye Soap" and on November 10, 1952, the certificate was issued.

On October 10, 1952, Thorsen and the petitioner sold, assigned, and transferred to Heidt, the copyright of the monologue and all their property, title, interest, and rights therein.

On November 10, 1952, Thorsen and the petitioner sold, assigned, and transferred the copyright and all of their right, title, and interest in the song, "Grandma's Lye Soap," to Magnolia Music Corporation, herein referred to as the Music Corporation, a California corporation wholly owned by Heidt.

On the same day, Thorsen and the petitioner entered into a contract with the Music Corporation whereby the Music Corporation agreed to pay each of them 1 cent for each record distributed.

The record, "It's in the Book," was finished and produced in 1952 and distributed through the facilities of Capitol Records in the United States and Canada, and Bourne Music, Ltd. of London, England. These distributors agreed to pay the Record Company a royalty of 4¼ cents per record and the Music Corporation a royalty of 4 cents per record for each record sold.

The petitioner reported no royalty income from the record in 1952. In 1953 royalties totaling $39,396.85 were reported. This aggregate amount included $24,450.90 from the Record Company, $14,975.58 from the Music Corporation and an understatement on the return of $29.63. These royalties were allocated on the petitioner's 1953 income tax return as follows:

| | |
|---|---|
| Taxable for year 1953 | $13,132.29 |
| Taxable for year 1952 | 13,132.28 |
| Taxable for year 1951 | 13,132.28 |

The tax liability of $12,749.55 shown on the return for 1953 was computed in accordance with section 107(b) of the Internal Revenue Code of 1939, as follows:

| | |
|---|---|
| 1951 additional taxes (husband) | $1,388.73 |
| 1951 additional taxes (wife) | 1,386.84 |
| 1952 additional taxes (husband) | 2,442.11 |
| 1952 additional taxes (wife) | 1,637.29 |
| 1953 tentative tax | 5,894.58 |
| | 12,749.55 |

On December 21, 1953, Heidt, successor to the Music Company, and Thorsen transferred to the petitioner, as a Christmas gift, all of their interests in royalty contracts for the record, "It's in the Book."

The petitioner reported $10,680.82 as royalties received from the record during 1954. The amount was composed of $1,579.50, roy-

alties accrued at the date of the gift from Heidt and Thorsen to the petitioner, $2,131.28, royalties earned attributable to Heidt and Thorsen's interests subsequent to the gift, $6,969.90, petitioner's royalty earning during 1954, and a 14-cent overstatement.

The royalty income of petitioner from this recording in 1953 was $39,426.48.

Work was commenced on this recording in 1950 and was completed in less than 36 months.

## OPINION.

Due to the graduated surtax rates, the tax on a large compensation received in a single year from an artistic work or an invention, the work on which was performed over a number of years, is greater than the total taxes that would have been payable had the compensation been received ratably over the period in which the work was performed.   Section 107 (b) [1] was incorporated into the Internal Revenue Code by the 1942 Act to afford relief to those individuals who derive the bulk of their compensation in one year from such an artistic work or an invention.

If the royalties received by the petitioner in 1953 are to qualify under the provisions of section 107 (b), two requisites must be fulfilled: First, the work on the artistic composition must cover a period of 36 calendar months or more from the beginning to the completion thereof; and second, the gross income received in the taxable year from such artistic work must be at least 80 per cent of the sum of the gross income received therefrom in the taxable year, in previous years and in the 12 months following the close of the taxable year.

The first question to be resolved is whether the work on the artistic composition covered the required 36-calendar-month period.   There is no controversy as to the date of completion, which was 1952; the dispute is over the date of commencement.

[1] SEC.   107.   COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE AND BACK PAY.

(b) PATENT, COPYRIGHT, ETC.—For the purposes of this subsection, the term "artistic work or invention," in the case of an individual, means a literary, musical, or artistic composition of such individual or a patent or copyright covering an invention of or a literary, musical, or artistic composition of such individual, the work on which by such individual covered a period of thirty-six calendar months or more from the beginning to the completion of such composition or invention.   If, in the taxable year, the gross income of any individual from a particular artistic work or invention by him is not less than 80 per centum of the gross income in respect of such artistic work or invention in the taxable year plus the gross income therefrom in previous taxable years and the twelve months immediately succeeding the close of the taxable year, the tax attributable to the part of such gross income of the taxable year which is not taxable as a gain from the sale or exchange of a capital asset held for more than 6 months shall not be greater than the aggregate of the taxes attributable to such part had it been received ratably over that part of the period preceding the close of the taxable year but not more than thirty-six calendar months.

The two leading cases in the area are *Jean de Marco*, 9 T.C. 1188 (1947) and *Iliff David Richardson*, 14 T.C. 547 (1950). In *de Marco*, we held that the date of commencement of a sculpture work was the date the petitioner received the letter announcing a competition for various sculpturing projects to decorate the new War Department building in Washington, and that work done on sketches or models of individual figures may not be counted where such work antedated both the announcement of the competition and petitioner's conception of the specific design or composition as an entirety. A variance in the facts resulted in a different conclusion in the *Richardson* case in which we held that where the petitioner had a specific intent to write a book concerning his war experiences, the date of commencement was when he began to make written memoranda of these experiences even though they were subsequently lost and had to be rewritten.

The petitioner, relying on the *Richardson* case, contends that the date of initiation of work was 1947 when the idea of making a phonograph record was suggested by Thorsen. He says that from that time until the recording was completed in 1952, he revised his routine in order to make it adaptable for a successful phonograph record. He adds that Thorsen occasionally assisted him in this.

The respondent contends that the specific adaptation theory of the *de Marco* case is applicable in this situation and that the date of commencement of work on the record was no earlier than 1950 when the petitioner joined the Heidt show and therefore the period was not sufficient to qualify under section 107(b).

The testimony tends to show that the work of converting the petitioner's material to a commercially acceptable phonograph recording was begun in 1950 rather than in 1947.

On this point Heidt testified:

Q. (By Mr. Legerton, petitioner's counsel) When he first came on the show [in 1950] did he have the material, in your opinion, to make a phonograph record?
A. He had the possibilities.
Q. The possibilities?
A. But not the material.
Q. Then was any effort made to get the material together?
A. Yes. May I say, along with four or five other people, we worked on the material, I mean like Frankie Carle at the piano, Gordon McCrae singing, and like John Standley. We worked with Johnny on his material.

\*        \*        \*        \*        \*        \*        \*

Q. (By Mr. McLeod, respondent's counsel) You said that I believe when he first came with you he had possibilities for having material for a record?
A. Yes.
Q. But he didn't have the material?
A. That's right. It had to be developed.

Q. Edited or developed?
A. Developed.

The testimony of Thorsen contradicts the petitioner's claim that Thorsen worked with him perfecting his material for recording purposes. Thorsen stated he made suggestions as to changes in the petitioner's routine but when queried as to the phonograph recording he testified:

Q. (By Mr. Legerton) Prior to the time that he joined the Heidt show, was there any effort on your part or on his part, if you know, toward making a phonograph recording?
A. Only that I said to him, "I think you have got the material here for a great novelty phonograph record. I think this just might be it. It's hard to say because these things are questionable, but you'd have to do a lot to it before it would be proper."

It is true that the idea of converting his material into a successful phonograph recording was conceived by Thorsen and suggested to the petitioner in 1947. However, it was held in *Beardsley* v. *United States*, 140 F. Supp. 541 (1956) that when the taxpayer was able to show only that he had conceived the basic idea and thought about it 36 months prior to its completion he failed to establish that he had begun work on it 36 months before its completion. It was further held, p. 543, that:

"Work" in the meaning of the statute must connote something more than the germinating of the idea and mental notice taking of passing data prior to the demonstrable decision to take affirmative action to perfect the idea. * * *

It is essential to distinguish between the routine used by the petitioner in his act and the material that comprised the phonograph recording. While the petitioner may have altered his routine many times prior to 1950, he has not shown that there was any attempt made to adapt it to a phonograph recording before 1950. It had only the *possibilities* for a recording and had to be *developed*. This task of development was the "work" contemplated by the statute.

The only conclusion that can be drawn from the evidence produced is that there was no specific adaptation of the material from the petitioner's routine to a composition for recording purposes until he became a member of the Heidt show in 1950. *Jean de Marco, supra.* The petitioner had the burden of showing error in the respondent's determination that the petitioner did not qualify for the benefits of section 107(b). He has not done so on this record and we sustain the respondent's determination.

It is unnecessary to consider whether the other requirements of section 107(b) have been met.

*Decision will be entered for the respondent.*